**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAM ROSENTHAL, ISKANDER KHAN, and LUIGI CIAVOLINO JR., on behalf of themselves and all others similarly situated, and SEAN BASINSKI, individually,<br>*Plaintiffs,*<br>- against -<br>GUASTAVINO'S INC.; ROSE GROUP PARK AVENUE LLC; BRIDGEMARKET ASSOCIATES, L.P.; MADDD 550 BROAD LLC; THE CITY OF NEW YORK; NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION; LOUIS ROSE; NYPD LIEUTENANT ANTHONY TAI (TAX #953465); NYPD OFFICER RUBENIAS CANAS (TAX #976507); NYPD OFFICER DYSMAIRY GUZMAN (TAX #958478); and JOHN DOE #1,<br>*Defendants.* | **Case No. 26-cv-________**<br><br>**NOTICE OF REMOVAL**<br><br>State Court Index No. 160745/2026 |

**NOTICE OF REMOVAL**

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK:**

Defendant MADDD 550 BROAD LLC ("MADDD"), by and through its undersigned counsel, Rosen Law LLC, hereby removes this civil action from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. sections 1331, 1343, 1367, 1441, and 1446. In support of removal, MADDD states as follows:

## <u>THE STATE COURT ACTION</u>

1. On August 24, 2026, Plaintiffs commenced an action in the Supreme Court of the State of New York, County of New York, captioned *Sam Rosenthal, Iskander Khan, and Luigi Ciavolino Jr., on behalf of themselves and all others similarly situated, and Sean Basinski, individually v. Guastavino's Inc., et al.*, Index No. 160745/2026 (the "State Court Action"), by filing a Complaint. (NYSCEF Doc. No. 2.)

2.The Complaint names MADDD as a defendant and alleges that MADDD acquired the lease for the property at issue in 2020 and is a party to a lease with the City of New York dated April 1, 2025. (Compl. paragraphs 10, 49-50.)

3.Pursuant to 28 U.S.C. section 1446(a), MADDD is filing contemporaneously, as separate attachments to this Notice, copies of all process, pleadings, and orders served upon MADDD in the State Court Action.

## FEDERAL-QUESTION JURISDICTION

4.This Court has original jurisdiction under 28 U.S.C. sections 1331 and 1343(a)(3)-(4) because the Complaint expressly asserts claims arising under the Constitution and laws of the United States.

5.The Complaint expressly invokes 42 U.S.C. section 1983 and alleges violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution. (Compl. paragraphs 16, 74-81.)

6.In particular, the Fourth Cause of Action asserts a claim under 42 U.S.C. section 1983 against alleged state actors; the Fifth Cause of Action asserts municipal liability under section 1983 against the City of New York; and the Sixth Cause of Action asserts a section 1983 claim against alleged private actors, including the defined "Corporate Defendants." (Compl. paragraphs 74-81.)

7.The Complaint defines the "Corporate Defendants" to include MADDD and alleges that those defendants acted jointly and in concert with the City of New York and members of the New York City Police Department under color of state law to deprive Plaintiffs of federal constitutional rights. (Compl. paragraphs 8, 80-81.)

8.Because the Complaint presents federal claims on its face, this action is removable under 28 U.S.C. section 1441(a).

9.This Court has supplemental jurisdiction under 28 U.S.C. section 1367(a) over the Complaint's state-law claims because they arise from the same alleged course of conduct and form part of the same Article III case or controversy as the federal claims.

10.Removal is based on federal-question jurisdiction, not solely on diversity jurisdiction. Accordingly, the forum-defendant limitation in 28 U.S.C. section 1441(b)(2) does not apply.

## VENUE AND ASSIGNMENT

11.The State Court Action is pending in New York County. The Southern District of New York embraces New York County. 28 U.S.C. section 112(b). Removal to this Court is therefore proper under 28 U.S.C. sections 1441(a) and 1446(a).

12.Because this action is removed from a state court in New York County, it is designated for assignment to the Manhattan courthouse under Rule 20(a)(1) of the Rules for the Division of Business Among District Judges of the Southern District of New York.

## TIMELINESS AND CONSENT

13.This Notice is timely under 28 U.S.C. section 1446(b)(1). The Complaint was filed on August 24, 2026, and this Notice is filed less than thirty days thereafter.

14.The Complaint alleges that the identity of John Doe #1 is presently unknown. (Compl. paragraph 8.) To the extent John Doe #1 remains unidentified and unserved as of the filing of this Notice, that defendant is not required to join in or consent to removal under 28 U.S.C. section 1446(b)(2)(A).

15. As of the filing of this Notice, based on the filings on the New York State Unified Court System, no defendant other than MADDD has been properly joined and served; therefore no co-defendant consent is presently required.

**NOTICE TO THE PARTIES AND THE STATE COURT**

16.Promptly after filing this Notice, MADDD will give written notice of the removal to all adverse parties and will file a copy of this Notice with the Clerk of the Supreme Court of the State of New York, County of New York, as required by 28 U.S.C. section 1446(d).

17.By filing this Notice, MADDD does not waive, and expressly reserves, all defenses, objections, and rights available under federal or state law, including defenses concerning service of process, personal jurisdiction, standing, and the sufficiency of the Complaint.

**WHEREFORE**, Defendant MADDD 550 Broad LLC respectfully gives notice that the State Court Action is removed to this Court.

Dated: New York, New York
September 8, 2026

**ROSEN LAW LLC**
*Attorneys for Defendant MADDD 550 Broad LLC*

By: ______________________
Gary Rosen
216 Lakeville Road
Great Neck, New York 11020
Telephone: 516-437-3400 x223
Email: grosen@rosenlawllc.com

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2026, after filing the foregoing Notice of Removal in the United States District Court for the Southern District of New York, I caused a true and correct copy of the Notice and its attachments to be served upon all counsel of record and all unrepresented parties by **Fedex for overnight service**, and caused a copy of the Notice to be filed with the Clerk of the Supreme Court of the State of New York, County of New York, in Sam Rosenthal, et al. v. Guastavino's Inc., et al., Index No. 160745/2026.

**ROSEN LAW LLC**
*Attorneys for Defendant MADDD 550 Broad LLC*

By: ________________________
Gary Rosen
216 Lakeville Road
Great Neck, New York 11020
Telephone: 516-437-3400 x223
Email: grosen@rosenlawllc.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

----------------------------------------------------------------------x

SAM ROSENTHAL, ISKANDER KHAN, and LUIGI CIAVOLINO JR., on behalf of themselves and all others similarly situated,

and

SEAN BASINSKI, individually,

Plaintiffs,

**Index No. ___________**

-against-

**COMPLAINT**

GUASTAVINO'S INC.; ROSE GROUP PARK AVENUE LLC; BRIDGEMARKET ASSOCIATES, L.P.; MADDD 550 BROAD LLC; THE CITY OF NEW YORK; NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION; LOUIS ROSE; NYPD LIEUTENANT ANTHONY TAI (TAX #953465); NYPD OFFICER RUBENIAS CANAS (TAX #976507); NYPD OFFICER DYSMAIRY GUZMAN (TAX #958478); and JOHN DOE #1,

Defendants.

----------------------------------------------------------------------x

Plaintiffs for their complaint, respectfully allege as follows:

## NATURE OF THE PROCEEDING

This case is about the brazen and illegal seizure of public space by a high-end private event company and a commercial real estate developer who, on a daily or near-daily basis, evict the general public from a public plaza in Midtown Manhattan.

In the 1990s, after years of community opposition to a city redevelopment plan for the city-owned land underneath and alongside the landmarked Queensboro Bridge, a deal was reached to lease the complex for private use as a supermarket/retail space/restaurant while preserving a small outdoor lot for public use as a sitting area and garden.

For years, however – by erecting physical barricades, employing security guards who deny non-paying members of the public entrance or request they leave, installing fraudulent signs claiming the space is private, enacting certain physical changes to the plaza to make it appear a private rather than public space, making an "agreement" with the local police precinct to aid in their illegal actions, and other measures – the companies have monetized the space for their private corporate profit, selling use (and illusion of exclusivity) of the garden to unknowing clients who pay up to $300,000 to hold a single dinner and reception in their adjacent event hall. The city, rather than enforcing the terms of the original deal on behalf of the public, actively participates in the illegal scheme by falsely claiming the space is private property and, upon request of the companies, evicting members of the public, arresting them, and charging them with trespassing.

Plaintiffs bring this case to return this small garden to public use and to right the wrongs that Defendants have caused by their illegal actions.

**THE PARTIES**

1. Plaintiff SAM ROSENTHAL ("Rosenthal') is a 58 year-old mentalist who lives in Brooklyn, New York.

2. Plaintiff ISKANDER KHAN ("Khan') is a 21 year-old recent college graduate who lives in Manhattan.

3. Plaintiff LUIGI CIAVOLINO JR. ("Ciavolino") is a 31 year-old veterinary technician who lives on Long Island and works in Manhattan. Rosenthal, Khan and Ciavolino are collectively referred to herein as the "Class Plaintiffs."

4. Plaintiff SEAN BASINSKI ("Basinski") is a 54 year-old entrepreneur who lives in Manhattan.

5. Defendant GUASTAVINO'S INC. ("Guastavino's") is a domestic corporation existing under the law of the State of New York. It is a 15,000-square-foot private event venue under the arches of the Queensboro Bridge, at 409 East 59th Street in New York.

6. Defendant ROSE GROUP PARK AVENUE LLC ("Rose Group Park Avenue") is a domestic limited liability corporation existing under the law of the State of New York. It operates and manages events at Guastavino's.

7. Defendant LOUIS ROSE ("Rose") is Chairman of Rose Group Park Avenue. Upon information and belief, he lives in Manhattan.

8. Defendant JOHN DOE #1 was, at all times relevant to this case, an employee of defendant GUASTAVINO's INC., ROSE GROUP PARK AVENUE LLC, BRIDGEMARKET ASSOCIATES and/or MADDD 550 BROAD LLC (collectively, "the Corporate Defendants") whose identity is presently unknown.

9. Defendant BRIDGEMARKET ASSOCIATES, L.P. ("Bridgemarket Associates") is a domestic limited partnership existing under the law of the State of New York. Upon

information and belief, it is a commercial real estate developer and landlord that holds and/or held the lease, with the City of New York, for the space at 409 East 59th Street in New York City.

10. Defendant MADDD 550 BROAD LLC ("Maddd 550 Broad") is a domestic limited liability company existing under the laws of the State of New York. Upon information and belief, it acquired the aforementioned lease from Defendant Bridgemarket Associates in 2020.

11. Defendant the CITY OF NEW YORK ("the City") is a municipal corporation existing under the laws of the State of New York.

12. Defendant NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION ("NYC EDC") is a not for-profit local development corporation existing under the laws of the State of New York.

13. Defendant ANTHONY TAI ("Lieutenant Tai") is a Lieutenant in the 19th Precinct of the New York City Police Department (the "NYPD"). At all times relevant to this case he was employed by the City of New York, acting within the scope of his employment and under color of state law, to wit, under the color of the statues, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York. He is sued in his individual and official capacity.

14. Defendant RUBENIAS CANAS ("Officer Canas") is or was an Officer in the 19th Precinct of the NYPD. At all times relevant to this case she was employed by the City of New York, acting within the scope of her employment and under color of state law, to wit, under

the color of the statues, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York. She is sued in her individual and official capacity.

15. Defendant DYSMAIRY GUZMAN ("Officer Guzman") is an Officer in the 19th Precinct of the NYPD. At all times relevant to this case she was employed by the City of New York, acting within the scope of her employment and under color of state law, to wit, under the color of the statues, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York. She is sued in her individual and official capacity.

## JURISDICTION AND VENUE

16. This court has subject-matter jurisdiction pursuant to Article VI, § 7 of the New York Constitution, which grants this court general original jurisdiction in law and equity. This court has concurrent jurisdiction over Plaintiff's claims under 42 U.S.C. §1983 which arise from the same facts and occurrences.

17. Venue is properly designated in the County of New York pursuant to CPLR §503 and §504 because the events giving rise to this action occurred in New York County and because one or more Defendants reside in, maintain an office in, or is a municipal defendant located in New York County.

## CLASS ACTION ALLEGATIONS

18. Pursuant to Article 9 of the CPLR, the Class Plaintiffs bring this action on behalf of a plaintiff class composed of all members of the public who have been excluded from the outdoor public space in front of 409 East 59th Street, New York, New York ("the Plaza") as a result of Defendant's actions and by virtue of not being guests, invitees or staff at events held in the adjacent event space, Guastavino's.

19. The plaintiff class is so numerous that joinder of all members is impracticable. Midtown Manhattan has a residential population density of more than 100,000 per square mile, making it among the most densely populated neighborhoods in the United States. East 59th Street is a busy transportation and commercial corridor that draws a large number of non-residents on a daily basis. Upon information and belief, dozens and perhaps hundreds of people use the Plaza daily when the Corporate Defendants are not holding events there and therefore not actively prohibiting members of the public from entering. Upon information and belief, the Corporate Defendants have excluded the plaintiff class from the Plaza for many years.

20. The questions of law and fact common to the plaintiff class predominate over any questions affecting only individual members. The central questions are, what is the legal status of the Plaza, what actions have Defendants taken to exclude members of the class from the Plaza, and whether Defendants had the right to do so.

21. The claims of the Class Plaintiffs are typical of those of the proposed class. Doe and Smith are ordinary members of the public who sought to use the plaza for ordinary public purposes, including entering, passing through, sitting, standing, reading, or remaining in the space. Like other members of the class, they were deterred from using the plaza, denied entry, or asked to leave by the Corporate Defendants' security personnel, employees, agents, signage, barriers, illegal modifications, or asserted claims of private control. The relief they seek – declaratory relief, injunctive relief, and equitable relief – is based on the same legal theories of the proposed class, including that the Plaza is public, that the Corporate Defendants have interfered with their right to use and enjoy that space, and that the Corporate Defendants lacked the right to do so. Plaintiff Basinski, who alleges he was assaulted in the Plaza, had his personal property thrown from the Plaza, was threatened with arrest, was arrested, and was charged with

trespassing, has claims which are *not* typical to those of the proposed class. He is *not* a member of the proposed class and does *not* seek appointment as a class representative, but brings his claims individually.

22. The Class Plaintiffs will fairly and adequately protect the interests of the class. Plaintiff's counsel has the legal resources and experience necessary to protect all members of the plaintiff class.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because (a) the class is narrowly drawn and limited, making this action readily manageable as a class action; (b) the members of the class have no interest in individual controlling the prosecution of separate actions; (c) Defendants have acted on grounds applicable to all class members, making declaratory, injunctive and equitable relief on behalf of the class necessary and appropriate; (d) no other litigation concerning the controversy has been commenced by members of the class, (e) the failure to afford class relief will result in a multiplicity of actions brought for identical relief, with the consequent delay and added expense associated with such actions; and (f) there is a risk of confusion arising from inconsistent adjudications if members of the class are required to bring individual actions.

## FACTUAL ALLEGATIONS

24. The entire city block bordered by East 59th Street, East 60th Street, First Avenue, and Sutton Place – identified in city maps as Block 1454, Lot 1 – is owned by the City of New York. The block was acquired by the City in or around 1900 for the construction of the Queensboro Bridge. After the opening of the bridge in 1909, the area under the bridge's majestic arches, and the open air plaza alongside it on East 59th Street, held a public market which was

known as a "free market" because farmers and fishermen were allowed to sell their wares without paying a stall fee.

25. After the public market closed in the 1940's, the space under and alongside the bridge on East 59th Street was used by various city agencies for storage and other purposes.

26. On April 16, 1974, the New York City Landmarks Preservation Commission ("the Landmarks Commission") declared the bridge a New York City landmark based on its "special character, special historical and aesthetic interest and value as part of the development, heritage and cultural characteristics of New York City."

27. In 1977, after several proposals to redevelop the space underneath and alongside the bridge had stalled, the New York City Public Development Corporation (predecessor to NYC EDC) issued a Request-for-Proposals for the space. On August 8, 1977, the New York City Planning Commission reviewed a proposed lease for the space to Harley Baldwin Associates, to "construct a two level mall with approximately 44,800 square feet under the arches and a greenhouse, farmers market and public plaza on the open space south of the bridge." Specifically, the plan called for the following:

> In the open space, south of the bridge, Baldwin Associates will install a completely new drain system and decorative pavement. The eastern portion of the area will be improved with trees, benches and plantings to create a public plaza. The western part of the open space will be occupied by a farmers market of two parallel sheds. A greenhouse, to be rented as a plant shop and/or a restaurant, will be erected in the intervening space.

28. Beginning in 1972, with the publication of the Queensboro Bridge Area Study, multiple city agencies and reports identified the lack of open public space in Midtown East. In 1989, a Department of City Planning report called the Queensboro Bridge Area Planning and

Zoning Options acknowledged the lack of open space in the neighborhood and suggested that additional publicly-accessible open spaces be created.

29. Baldwin Associates' plan faced opposition from the local community boards and the New York State Assembly, which delayed the redevelopment project for years. However, on July 1, 1986, the City entered into a lease with Defendant Bridgemarket Associates, a partnership between Harley Baldwin Associates and Sheldon Gordon, a Las Vegas real estate developer.

30. In April 1988, after construction had begun, a local community group, Sutton Area Community, sued the City, the NYC EDC, and Bridgemarket Associates, claiming that the size and scope of the project exceeded what had previously been approved by the New York City Board of Estimate.

31. Years of litigation ensued. By the time that Bridgemarket Associates and the City prevailed on appeal to the New York Court of Appeals, in 1994, the project had been scaled back. As described by the project architects, Hardy Holzman Pfeiffer Associates LLP, "the developers agreed to scale down the project by providing less commercial space and more public space." As the architect described, "an outdoor restaurant and an enclosed greengrocer's stand was eliminated from the plaza, while a greenhouse and landscaped outdoor plaza was to be added." As Barry Schneider, Chairman of Manhattan Community Board 8, wrote years later, "[t]he original plans called for two structures to be built on the plaza - only one was eventually built."

32. On August 15, 1995, the Landmarks Commission approved the revised plan for the space. The Commission noted with approval that the changes, including the removal of the

restaurant building from the Plaza, "recalled more accurately the historic open character and public accessibility of the plaza area."

33. After Bridgemarket Associates proposed additional design revisions, the Landmarks Commission continued to safeguard the public nature of the Plaza. For example, the Commission called for the height of the Plaza (which had been raised to accommodate retail space below) to be lowered so as to "enhance the visual and physical accessibility of the plaza by the public and therefore provide a further improved public-space from which to appreciate the special architectural and historic qualities of the monumental landmark bridge." A Landmarks Commission permit, issued on January 7, 1997, noted with approval the "improved public space."

34. On February 27, 1998, Mayor Rudy Giuliani announced the long-awaited Bridgemarket project was nearing completion. Under the deal, the City would lease the space under a master lease to Bridgemarket Associates, who would then sublease the space for use as a supermarket, a furniture store (which had replaced the greenhouse,) and a restaurant. Mayor Guiliani's press release boasted of the "new 20,000 square foot public plaza on the 59th Street side of the bridge."

35. On December 8, 1999, the first of the three tenants to occupy the space – the Terence Conran Shop, a British furniture retailer, opened its doors to the public. The supermarket, Food Emporium, and the restaurant, Guastavino's, opened their doors in 2000.

36. On July 9, 2001, the Art Commission of the City of New York, which has jurisdiction over permanent works of architecture, landscape architecture, and art proposed on city-owned property, approved the installation of a mosaic-covered fountain which had originally

been installed inside the public. The fountain, entitled Abundance, by Edwin Blashfield, was to be installed on "59th Street, between 1st and York Avenues across from the Bridgemarket public space," the application stated.

37. On May 19, 2003, the Art Commission approved the installation of a plaque next to the Blashfield fountain. The approval stated that the plaque was to be installed at "Bridgemarket Public Plaza."

38. The Municipal Art Society, founded in 1893 to "beautify New York with public art," had funded the restoration of the historic Blashfield fountain. At the dedication ceremony on June 3, 2003, attended by Deputy Mayor Patricia Harris, the president of the Municipal Art Society remarked that "[o]riginally on the southeast side of the bridge, the fountain was relocated to the east end of the new public plaza during the renovation of Bridgemarket, by Hardy Holzman Pfeiffer Associates, completed in 1999."

39. The Plaza's status as a public space was recognized and celebrated by other non-profit organizations. For example, the New York City Landmarks Conservancy, a non-profit organization dedicated to preserving and protecting New York's unique architectural heritage, gave Bridgemarket its Lucy G. Moses Preservation Award in 2000. According to Roger Lang, its then-Director of Community Programs, the Conservancy had "advocated tirelessly on Bridgemarket's behalf" since the inception of the project in 1977. The inscription on the award applauded the return of the city property to public use, with shops and a restaurant inside while "outside, a landscaped public plaza completes this remarkable retrieved ensemble."

40. In 2003, the Bruner Foundation awarded Bridgemarket its Rudy Bruner Award for Urban Excellence. In a 56-page report detailing the entire history of the redevelopment project,

the Bruner Foundation described, along with the supermarket, retail store, and restaurant, the "public plaza and garden" which was "created as an amenity for the neighborhood."

41. On October 2, 2002, the New York City Planning Commission approved a resolution authorizing a new lease of the property, via the NYC EDC, to Bridgemarket Associates. This resolution, which was approved by the City Council on November 28, 2002 and approved by the Manhattan Borough Board on December 18, 2003, described a "public plaza along East 59th Street with landscaping and seating areas."

42. In 2005, Guastavino's closed its doors as a restaurant and reopened as a private event venue. In 2006, the following year, Defendant Rose Group Park Avenue took control of Guastavino's, which it began to market as "one of NYC's premier landmark gala and wedding destinations."

43. Beginning in or around 2006, upon information and belief, Guastavino's and the Rose Group Park Avenue began to advertise, market and sell exclusive access to, and use of, the Plaza (which they market as their "private garden") to their clients seeking to hold weddings, bar mitzvahs, galas, corporate conferences, and other events in their adjacent event hall. This use included the placement of corporate signage and installations on the Plaza, the placement of carpets on the Plaza, the projection of custom and corporate lighting onto the Plaza, the installation of games on the Plaza for exclusive use of events guests, the placement of tables, chairs and sofas on the Plaza for exclusive use of event guests, and the serving of food and beverages, including alcoholic beverages, exclusively to event guests, on the Plaza. Upon information and belief, the marketing and sale of the exclusive use of the Plaza allowed Guastavino's and Rose Group Park Avenue to profit from the Plaza by attracting more potential clients to book events in their adjacent event hall, convincing more clients to actually book

events, and permitting them to charge those clients more than they otherwise would have been to charge.

44. Upon information and belief, none of the Corporate Defendants obtained special events permits issued from the City for the aforementioned use of the Plaza.

45. As of August 1, 2026, the Guastavino's web site advertises and offers "outdoor space" for events.

46. Beginning in or around 2006, upon information and belief, Guastavino's and Rose Group Park Avenue began to close the Plaza to members of the public who were not affiliated with events taking place inside (via stanchions, security guards standing at the entrance to the Plaza instructing the public that the Plaza was closed, security guards approaching members of the public who had already entered the Plaza and instructing them to leave) even when the Plaza was not being actively used for events. Upon information and belief, this was done to create the appearance of an exclusive private garden for guests who were entering the event space or who left momentarily to smoke a cigarette, take a phone call, etc. in the Plaza. Upon information and belief, the marketing and sale of the existence of this exclusive "private garden" allowed Guastavino's and Rose Group Park Avenue to profit by attracting more potential clients to book events in their adjacent event hall, convincing more clients to actually book events, and permitting them to charge those clients more than they otherwise would have been to charge.

47. Between 2000 and 2020, upon information and belief, the Corporate Defendants made a series of changes to the Plaza which were not authorized by the Landmarks Commission, nor other city agencies, and which did not conform to their original proposals for the space, including:

a) placing "Guastavino's" signage on each side of the main Plaza entrance on East 59th Street, creating the impression that the Plaza is part of the event venue, rather than a public space adjacent to it;

b) installing a trellis and planters at that same main Plaza entrance, narrowing its width by two-thirds;

c) Installing additional trellises at each end of the Plaza and planting cultivating vines that climb those trellises, visually enclosing the space further;

d) removing the benches that were originally planned and shown in architectural drawings submitted and which existed when the Plaza opened;

e) installing approximately 20 metal planters containing trees and bushes, despite the specific demand from the Landmarks Commission that planters not be placed on the Plaza;

f) installing strings of overhead lights which form a canopy covering the entire Plaza and stretch from lightpoles near East 59th Street to the facade of the bridge itself;

g) installing multiple signs stating "PRIVATE GARDEN – Available to the public at the discretion of Bridgemarket Associates," and

h) installing a sign near the eastern end of the Plaza (which employees of the Corporate Defendants use for parking their private vehicles) which reads "No Trespassing - Private Property - Violators Will Be Prosecuted."

48. Upon information and belief, the aforementioned physical changes to the Plaza were made in violation of the Corporate Defendants' leases with the City, which have required them to "protect the landmark nature of the Bridge and Plaza" and to receive prior written

approval from the City for any "work that would change, in any respect, the Bridge or the Arches and any plazas, open space or the exterior of any of the buildings on the premises."

49. Upon information and belief, in 2020, Defendant MADDD 550 Broad acquired the lease from Bridgemarket Associates for $42 million.

50. The lease between Defendant Maddd 550 Broad and the City, dated April 1, 2025, requires Maddd 550 Broad to maintain the Plaza as "a sitting area accessible to the public." It also imposes on Maddd 550 Broad certain obligations (for example, to provide adequate security on the Plaza and to clean the Plaza each morning and evening) that are consistent with its obligation to maintain the Plaza for public use.

51. Some time in or around 2015, Plaintiff Khan was sitting in the Plaza. An employee of the Corporate Defendants asked him to leave. He left. Today, he frequently walks by the Plaza, sees it barricaded, and does not enter. He would like to visit and enjoy the Plaza and intends to do so if it is declared a public space.

52. During the summer of 2020, when gymnasiums in New York were closed due to COVID, Plaintiff Basinski went to the Plaza to exercise. An employee from the Corporate Defendants told him he could not exercise there. Basinski left.

53. On March 31, 2023, Basinski went to the Plaza to take photographs of several items of merchandise to sell on Ebay. Two employees of the Corporate Defendants told Basinski that he was trespassing on private property and requested that he leave. Basinski asked for a copy of the lease that the employees claimed gave them power to exclude others from the Plaza. One of the employees stated that, irrespective of what the lease said, the NYPD "understands, in the Community Affairs division, what the arrangement is." Basinski left.

54. On June 7, 2023, Basinski again went to the Plaza to take photos. Two employees of the Corporate Defendants told Basinski that the Plaza was "part of the event space," that it was "private space" and that he was trespassing and had to leave. Basinski requested proof that the space was private, but received none. He left.

55. On March 13, 2024, Basinski again went to use and enjoy the Plaza. An employee of the Corporate Defendants told Basinski that the Plaza was private property, that he had to leave, and that the police had been called and were on their way. Basinski requested documentation to support the Corporate Defendants' claim to the Plaza. The security guard claimed that the signs posted around the Plaza (declaring it a private garden) were sufficient legal basis. After waiting about ten minutes, the police did not arrive, and Basinski left.

56. In February, 2025, Plaintiff Ciavolino obtained employment nearby and began to, on occasion, use and enjoy the Plaza. On approximately five occasions over the following eighteen months, Ciavolino was denied access to the Plaza by the Corporate Defendants, who placed barricades at the entrance to the Plaza and told him it was closed. He would like to be able to use the Plaza freely according to his own schedule and without regard to whether the Corporate Defendants have closed it on any given day.

57. On May 25, 2025, Basinski again went to take photos at the Plaza. An employee of the Corporate Defendants told Basinski that the Plaza was private property, that he had to leave, and asked why he could not respect the "private property" signs. Basinski left.

58. During the summer of 2025, Plaintiff Rosenthal visited the Plaza while exploring Midtown East with his wife. After entering, he was asked to leave by an employee of the Corporate Defendants, who told him the Plaza was closed. He left. Assuming that the Plaza was

not a public space, he has not returned. Rosenthal would like to return to use and enjoy the Plaza and intends to do so if it is declared a public space.

59. On December 3, 2025, Basinski went to the Plaza to take photographs of merchandise for Ebay. Several individuals employed by the Corporate Defendants instructed Basinski to leave. Basinski refused and continued to photograph his Ebay merchandise. Defendant Rose told Basinski the Plaza was "my property," then picked up various of Basinski possessions and threw them toward 59th Street. Defendant John Doe #1, an employee of the Corporate Defendants, told Basinski to stop recording him, then struck Basinski in the hand, knocking his phone to the ground. Basinski called 911 to report that six individuals (owners or employees of the Corporate Defendants) were surrounding him in public space, had taken his property, and were threatening him. Shortly thereafter, Lieutenant Tai and another officer from the NYPD's 19th Precinct arrived at the Plaza. Basinski explained to the officers that he had a longstanding dispute with the Corporate Defendants over whether the Plaza was public space, stated that he believed it was, asked for any documentation to the contrary, and offered to show Lieutenant Tai evidence, on his phone, that the Plaza constituted public space. Insisting that the Plaza was private space, Lieutenant Tai then arrested Basinski, placed him in handcuffs, and had him transported to the 19th Precinct. Basinski was charged with Trespassing in violation of Section 140.05 of the New York State Penal Law.

60. On December 22, 2025, the Trespassing charge against Basinski was dismissed at New York City Criminal Court.

61. On April 11, 2026, Basinski went to the Plaza. A security guard employed by the Corporate Defendants instructed Basinski that the Plaza was closed for a private party, that he had to leave, and that he was trespassing. The guard told Basinski he did not press charges

because, as he stated, "I know the police." Basinski left.

62. On April 16, 2026, Basinski went to the Plaza. Security guards employed by the Corporate Defendants instructed Basinski he had to leave, and instructed him that "this time, you're going to get locked up - you're going to go to the hospital, then you're going to go to jail" and that "this is the last time I'm warning you." Basinski left.

63. On April 17, 2026, Basinski visited the Plaza to read a book. Security guards employed by the Corporate Defendants called the NYPD. Upon arriving, Defendant Officers Canas and Guzman told Basinski to leave the Plaza because it was private property, because "they had issues with you in the past" and because "they don't want you here." Officer Canas told Basinski that she knew it was private property because she was from the 19th Precinct and was familiar with the location because she went there "very often." Basinski asked the officers for paperwork to support their claim that it was private property, to which Officer Canas replied, "I don't need paperwork." Basinski told the officers that it was public property and that he had done research establishing that fact, which he offered to share, which offer was not accepted. NYPD Officer Michael Hernandez told Plaintiff "you can't be here any more." Officer Canas told him that "I'm asking you to please not return." Seven NYPD officers, including Lieutenant Stephen Schoefer, escorted Plaintiff from the Plaza. Officer Guzman told Plaintiff he would be arrested if he returned because it was private property and because the Corporate Defendants did not want him there.

64. On July 24 and July 25, 2026, a production company filmed a high-budget studio production (believed to be entitled "Escorted") for Amazon Prime Video inside Guastavino's, barricading and closing the entire Plaza and filling it with cameras, crew and equipment. Upon information and belief, the production company involved paid Guastavinos' and/or Rose Group

Park Avenue for the use of the space, including the use of the Plaza. Upon information and belief, the City granted no permit and received no fee for the use of the Plaza.

65. On August 11, 2026, Basinski went to the Plaza to film a short Instagram video with his phone. A security guard employed by the Corporate Defendants instructed Basinski that he could not record a video at the Plaza because it was private property. Basinski left.

66. Basinski wishes to return to the Plaza to, *inter alia,* photograph items to sell on Ebay and to make short Instagram videos about how he has been excluded from the Plaza, but is reluctant to do so due to Defendants' actions.

## FIRST CAUSE OF ACTION
## (DECLARATORY JUDGMENT - CPLR § 3001)

67. Plaintiffs repeats and reallege the allegations contained in all preceding paragraphs as if set forth in full.

68. An actual, present and justiciable controversy exists between Plaintiffs and Defendants with respect to the legal status and public accessibility of the Plaza, including the authority of Defendants to exclude members of the public (who are not affiliated with events taking place inside) at their discretion, making a judicial declaration necessary to resolve the parties' rights and to prevent further deprivation of access by the public.

## SECOND CAUSE OF ACTION
## (PUBLIC NUISANCE)

69. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

70. The Corporate Defendants have engaged, and continue to engage, in conduct, as described, which substantially interferes with the rights of the public to occupy, use, and enjoy the Plaza, thereby constituting a public nuisance.

71. Plaintiff Basinski, who lives less than a block away from the Plaza, has had his property taken from him and thrown into the street, been threatened with assault, been assaulted, been arrested, been instructed not to return to the Plaza, and been threatened with arrest if he does so. Thus, while the general public has suffered and is suffering harm by its inability to use and enjoy the Plaza, Basinski has suffered, and continues to suffer, special injury which is different in kind from that suffered by the general public.

**THIRD CAUSE OF ACTION**
**(UNJUST ENRICHMENT)**

72. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

73. Defendants Guastavino's and the Rose Group Park Avenue have actively advertised, marketed and sold exclusive access to and use of the Plaza (their "private garden") as part of their private event offerings, while excluding the public from that same public space, thereby obtaining revenues, price premiums, rental enhancements, avoided costs, and other economic gains directly attributable to their unauthorized control and illegal commercial exploitation of the Plaza, and have therefore been unjustly enriched.

**FOURTH CAUSE OF ACTION**
**(42 USC §1983 - STATE ACTORS)**

74. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

75. Lieutenant Tai unlawfully arrested Plaintiff Basinski, intended to confine him, and confined him without probable cause to believe that Basinski had committed any offense or violated any law, under color of state law and in violation of the First, Fourth and Fourteenth Amendments of the U.S. Constitution.

76. Officers Canas and Guzman, under threat of arrest and by a show of physical force and authority, ordered Plaintiff Basinski to leave the Plaza, a public space where had the right to be, an order to which Basinski complied. The officers acted under color of state law and in violation of the First, Fourth and Fourteenth Amendments of the U.S. Constitution.

**FIFTH CAUSE OF ACTION**
**(42 USC §1983 MUNICIPAL LIABILITY)**

77. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

78. Defendant the City, specifically the New York Police Department 19th Precinct, has an "arrangement" with the Corporate Defendants and has engaged in the practice, over multiple years and on many occasions, of violating the rights of members of the public to freely use and enjoy the Plaza, a public space. The City has engaged in a pattern and practice of, in response to requests from the Corporate Defendants, ordering members of the public to leave the Plaza on the false claim that it is private property, threatening them with arrest, and arresting them, under color of state law, without lawful authority, without probable cause and in violation of their rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

**SIXTH CAUSE OF ACTION**
**(42 USC §1983 - PRIVATE ACTOR)**

79. Plaintiffs repeats and reallege the allegations contained in all preceding paragraphs as if set forth in full.

80. The Corporate Defendants and Rose, despite being private actors, not state actors, acted under color of state law for purposes of 42 USC §1983 by acting jointly and in concert with the City – specifically the NYPD 19th Precinct, with whom the Corporate Defendants and Rose had "an arrangement" – by repeatedly summoning, requesting, directing, and encouraging NYPD officers, lieutenants and sergeants from the 19th Precinct to remove members of the public (who were not affiliated with events taking place inside Guastavino's) from the public space, resulting in the exclusion, eviction, detention, arrest, threatened arrest and removal of members of the public, including Basinski, from public space, in violation of their constitutional rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

81. The Corporate Defendants and Rose did, over the course of years, falsely and fraudulently inform the NYPD 19th Precinct that the Plaza was private space over which they exercised authority to remove members of the public, thereby using state authority to accomplish exclusions, evictions and arrests that they could not lawfully conduct on their own, depriving members of the public, including Basinski, of their rights secured by the First, Fourth and Fourteenth Amendments of the U.S. Constitution, including the right to be free from unreasonable seizure and arrest without probable cause.

**SEVENTH CAUSE OF ACTION**
**(TRESSPASS TO CHATTELS)**

82. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

83. Defendants Rose and John Doe #1 did, without his consent and with the intent to interfere with Plaintiff Basinski's personal property, grab hold of that property, consisting of various shoes and accessories he was photographing, and throw them out of the Plaza and into the street on East 59th Street, thereby impairing Basinski's ability to use that property.

**EIGHTH CAUSE OF ACTION**
**(ASSAULT & BATTERY)**

84. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

85. Defendant John Doe #1 did, with intent to do so, place Plaintiff Basinski in reasonable apprehension of imminent harmful or offensive unwanted bodily contact, and did, with intent to do so, cause offensive and unwanted bodily contact, by approaching Basinski, raising his hand, and striking Basinski in the hand.

86. Defendant John Doe #1 acted within the scope of his employment and in furtherance of the Corporate Defendants' business practices, making the Corporate Defendants liable under respondeat superior and/or because they directed, authorized, ratified, or maintained the practices that caused the contact.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that the court enter judgement in this action:

1) certifying the class pursuant to Article 9 of the CPLR;

2) declaring the plaza on city-owned property in front of 409 East 59th Street in New York to be a public space;

3) enjoining the Corporate Defendants from selling, renting or using the Plaza in furtherance of events taking place in their adjacent indoor event space, known as Guastavino's, or excluding from the Plaza any member of the public (via ropes, barricades, words or actions by their employees, etc.) due to the fact that they are not staff, clients or guests of events taking place at Guastavino's;

4) ordering the Corporate Defendants to restore and return the Plaza to such condition and state so as to conform to plans submitted to and approved by the City;

5) holding that the Corporate Defendants' practice of excluding members of the general public (who are not staff, clients, or guests of events taking place at Guastavino's) from the Plaza, depriving them of the use and enjoyment of the space, constitutes a public nuisance;

6) ordering an accounting of the revenue derived by the Corporate Defendants as a result of their illegal and unauthorized use of the Plaza, for which they were unjustly enriched, to be paid into a into a court-approved restoration fund dedicated to the preservation of public space in Midtown East;

7) awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

8) granting Plaintiffs disbursements, costs and attorney fees incurred in this action, and

9) granting such other and further relief as the court may deem just and proper.

Dated: New York, New York
August 24, 2026

Sean Basinski, Esq.
1073 First Avenue, #44
New York, NY 10022
seaninnigeria@gmail.com