**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

SAM ROSENTHAL, ISKANDER KHAN, and LUIGI CIAVOLINO JR., on behalf of themselves and all others similarly situated,

and

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

SEAN BASINSKI, individually,

Plaintiffs

,

1:26-CV-07715-JAV-RFT

-against-

GUASTAVINO'S INC.; ROSE GROUP PARK AVENUE LLC; BRIDGEMARKET ASSOCIATES, L.P.; MADDD 550 BROAD LLC; THE CITY OF NEW YORK; NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION; LOUIS ROSE; NYPD LIEUTENANT ANTHONY TAI (TAX #953465); NYPD OFFICER RUBENIAS CANAS (TAX #976507); NYPD OFFICER DYSMAIRY GUZMAN (TAX #958478); and JOHN DOE #1,

Defendants.

-----------------------------------------------------------------------x

Plaintiffs for their complaint, respectfully allege as follows:

## NATURE OF THE PROCEEDING

This case is about the brazen and illegal seizure of public space by a high-end private event company and a commercial real estate developer who, on a daily or near-daily basis, evict the general public from a public plaza in Midtown Manhattan.

In the 1990s, after years of community opposition to a city redevelopment plan for the city-owned land underneath and alongside the landmarked Queensboro Bridge, a deal was reached to lease the complex for private use as a supermarket/retail space/restaurant while preserving a small outdoor lot for public use as a sitting area and garden.

For years, however – by erecting physical barricades, employing security guards who deny non-paying members of the public entrance or request they leave, installing fraudulent signs claiming the space is private, enacting certain physical changes to the plaza to make it appear a private rather than public space, making an "agreement" with the local police precinct to aid in their illegal actions, and other measures – the companies have monetized the space for their private corporate profit, selling use (and illusion of exclusivity) of the garden to unknowing clients who pay up to $300,000 to hold a single dinner and reception in their adjacent event hall. The city, rather than enforcing the terms of the original deal on behalf of the public, actively participates in the illegal scheme by falsely claiming the space is private property and, upon request of the companies, evicting members of the public, arresting them, and charging them with trespassing.

Plaintiffs bring this action to return this small garden to public use and to right the wrongs that Defendants have caused by their illegal actions.

## THE PARTIES

1. Plaintiff SAM ROSENTHAL ("Rosenthal") is a 58 year-old mentalist who lives in Brooklyn, New York.

2. Plaintiff ISKANDER KHAN ("Khan") is a 21 year-old recent college graduate who lives in Manhattan.

3. Plaintiff LUIGI CIAVOLINO JR. ("Ciavolino") is a 31 year-old veterinary technician who lives on Long Island and works in Manhattan. Rosenthal, Khan and Ciavolino are

collectively referred to herein as the “Class Plaintiffs.”

4. Plaintiff SEAN BASINSKI (“Basinski”) is a 54 year-old entrepreneur who lives in Manhattan.

5. Defendant GUASTAVINO’S INC. (“Guastavino’s”) is a domestic corporation existing under the law of the State of New York. It is a 15,000-square-foot private event venue under the arches of the Queensboro Bridge, at 409 East 59th Street in New York City.

6. Defendant ROSE GROUP PARK AVENUE LLC (“Rose Group Park Avenue”) is a domestic limited liability corporation existing under the law of the State of New York. It operates and manages events at Guastavino’s.

7. Defendant LOUIS ROSE (“Rose”) is Chairman of Rose Group Park Avenue. Upon information and belief, he lives in Manhattan.

8. Defendant JOHN DOE #1 was, at all times relevant to this case, an employee of defendant GUASTAVINO’s INC., ROSE GROUP PARK AVENUE LLC, BRIDGEMARKET ASSOCIATES and/or MADDD 550 BROAD LLC (“collectively, “the Corporate Defendants”) whose identity is presently unknown.

9. Defendant BRIDGEMARKET ASSOCIATES, L.P. (“Bridgemarket Associates”) is a domestic limited partnership existing under the law of the State of New York. Upon information and belief, it is a commercial real estate developer and landlord that holds and/or held the lease, with the City of New York, for the space at 409 East 59th Street in New York City.

10. Defendant MADDD 550 BROAD LLC (“Maddd 550 Broad”) is a domestic limited liability company existing under the laws of the State of New York. Upon information and belief, it acquired the aforementioned lease from Defendant Bridgemarket Associates in 2020.

11. Defendant the CITY OF NEW YORK ("the City") is a municipal corporation existing under the laws of the State of New York.

12. Defendant NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION ("NYC EDC") is a not for-profit local development corporation existing under the laws of the State of New York.

13. Defendant ANTHONY TAI ("Lieutenant Tai") is a Lieutenant in the 19th Precinct of the New York City Police Department (the "NYPD"). At all times relevant to this case he was employed by the City of New York, acting within the scope of his employment and under color of state law, to wit, under the color of the statues, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York. He is sued in his individual and official capacity.

14. Defendant RUBENIAS CANAS ("Officer Canas") is or was an Officer in the 19th Precinct of the NYPD. At all times relevant to this case she was employed by the City of New York, acting within the scope of her employment and under color of state law, to wit, under the color of the statues, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York. She is sued in her individual and official capacity.

15. Defendant DYSMAIRY GUZMAN ("Officer Guzman") is an Officer in the 19th Precinct of the NYPD. At all times relevant to this case she was employed by the City of New York, acting within the scope of her employment and under color of state law, to wit, under the color of the statues, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York. She is sued in her individual and official capacity.

## JURISDICTION AND VENUE

16. This court has federal-question jurisdiction over the §1983 claims under 28 U.S.C.

§§ 1331 and 1343, and supplemental jurisdiction over the related New York claims under 28 U.S.C. § 1367.

17. Venue is properly laid in the Southern District of New York under 28 USC § 1391(b) because the events giving rise to the claims occurred and arose in this district.

**CLASS ACTION ALLEGATIONS**

18. Pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), the Class Plaintiffs bring this action on behalf of a plaintiff class composed of all members of the public who have been excluded from the outdoor public space in front of 409 East 59th Street, New York, New York ("the Plaza") as a result of Defendants' actions and by virtue of not being guests, invitees or staff at events held in the adjacent event space, Guastavino's.

19. The plaintiff class is so numerous that joinder of all members is impracticable. Midtown Manhattan has a residential population density of more than 100,000 per square mile, making it among the most densely populated neighborhoods in the United States. East 59th Street is a busy transportation and commercial corridor that draws a large number of non-residents on a daily basis. Upon information and belief, dozens and perhaps hundreds of people use the Plaza daily when the Corporate Defendants are not holding events there and therefore not actively prohibiting members of the public from entering. Upon information and belief, the Corporate Defendants have excluded the plaintiff class from the Plaza for many years.

20. The questions of law and fact common to the plaintiff class predominate over any questions affecting only individual members. The central questions are, what is the legal status of the Plaza, what actions have Defendants taken to exclude members of the class from the Plaza, and whether Defendants had the right to do so.

21. The claims of the Class Plaintiffs are typical of those of the proposed class.

Rosenthal, Khan and Ciavolino are ordinary members of the public who sought to use the plaza for ordinary public purposes, including entering, passing through, sitting, standing, reading, or remaining in the space. Like other members of the class, they were deterred from using the plaza, denied entry, or asked to leave by the Corporate Defendants' security personnel, employees, agents, signage, barriers, illegal modifications, or asserted claims of private control. The relief they seek – declaratory relief, injunctive relief, equitable relief, and damages – is based on the same legal theories of the proposed class, including that the Plaza is public, that the Corporate Defendants have interfered with their right to use and enjoy that space, and that the Corporate Defendants lacked the right to do so. Plaintiff Basinski, who alleges he was assaulted in the Plaza, had his personal property thrown from the Plaza, was threatened with arrest, was arrested, and was charged with trespassing, has claims which are *not* typical to those of the proposed class. He is *not* a member of the proposed class and does not seek appointment as a class representative, but brings his claims individually.

22. The Class Plaintiffs will fairly and adequately protect the interests of the class. Plaintiff's counsel has the legal resources and experience necessary to protect all members of the plaintiff class.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because (a) the class is narrowly drawn and limited, making this action readily manageable as a class action; (b) the members of the class have no interest in individual controlling the prosecution of separate actions; (c) Defendants have acted on grounds applicable to all class members, making declaratory, injunctive and equitable relief on behalf of the class necessary and appropriate; (d) no other litigation concerning the controversy has been commenced by members of the class, (e) the failure to afford class relief will result in a multiplicity of actions brought for identical relief, with the consequent delay and added expense associated with such actions; and (f) there is a risk of confusion arising from inconsistent

adjudications if members of the class are required to bring individual actions.

24. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class. Among other things, the Corporate Defendants maintained and enforced a common policy or practice of treating the Plaza as private property and excluding members of the public from it, while the City assisted in, acquiesced in, or failed to correct that practice. A declaration establishing the public status of the Plaza and the rights of members of the public to use it, together with appropriate injunctive relief prohibiting Defendants from excluding members of the public except pursuant to lawful and uniformly applicable restrictions, would resolve issues applicable to the class as a whole.

## FACTUAL ALLEGATIONS

25. The entire city block bordered by East 59th Street, East 60th Street, First Avenue, and Sutton Place – identified in city maps as Block 1454, Lot 1 – is owned by the City of New York. The block was acquired by the City in or around 1900 for the construction of the Queensboro Bridge. After the opening of the bridge in 1909, the area under the bridge's majestic arches, and the open plaza alongside it on East 59th Street, held a public market which was known as a "free market" because farmers and fishermen were allowed to sell their wares without paying a stall fee.

26. After the public market closed in the 1940's, the space under and alongside the bridge on East 59th Street was used by various city agencies for storage and other purposes.

27. On April 16, 1974, the New York City Landmarks Preservation Commission ("the Landmarks Commission") declared the bridge a New York City landmark based on its "special character, special historical and aesthetic interest and value as part of the development, heritage and cultural characteristics of New York City."

28. In 1977, after several proposals to redevelop the space underneath and alongside the bridge had stalled, the New York City Public Development Corporation (predecessor to NYC EDC) issued a Request-for-Proposals for the space. On August 8, 1977, the New York City Planning Commission reviewed a proposed lease for the space to Harley Baldwin Associates, to "construct a two level mall with approximately 44,800 square feet under the arches and a greenhouse, farmers market and public plaza on the open space south of the bridge." Specifically, the plan called for the following:

> In the open space, south of the bridge, Baldwin Associates will install a completely new drain system and decorative pavement. The eastern portion of the area will be improved with trees, benches and plantings to create a public plaza. The western part of the open space will be occupied by a farmers market of two parallel sheds. A greenhouse, to be rented as a plant shop and/or a restaurant, will be erected in the intervening space.

29. Beginning in 1972, with the publication of the Queensboro Bridge Area Study, multiple city agencies and reports identified the lack of open public space in Midtown East. In 1989, a Department of City Planning report called the Queensboro Bridge Area Planning and Zoning Options acknowledged the lack of open space in the neighborhood and suggested that additional publicly-accessible open spaces be created.

30. Baldwin Associates' plan faced opposition from the local community boards and the New York State Assembly, which delayed the redevelopment project for years. However, on July 1, 1986, the City entered into a lease with Defendant Bridgemarket Associates, a partnership between Harley Baldwin Associates and Sheldon Gordon, a Las Vegas real estate developer.

31. In April 1988, after construction had begun, a local community group, Sutton Area Community, sued the City, the NYC EDC, and Bridgemarket Associates, claiming that the size and scope of the project exceeded what had previously been approved by the New York City Board of Estimate.

32. Years of litigation ensued. By the time that Bridgemarket Associates and the City prevailed on appeal to the New York Court of Appeals, in 1994, the project had been scaled back. As described by the project architects, Hardy Holzman Pfeiffer Associates LLP, "the developers agreed to scale down the project by providing less commercial space and more public space." As the architect described, "an outdoor restaurant and an enclosed greengrocer's stand was eliminated from the plaza, while a greenhouse and landscaped outdoor plaza was to be added." As Barry Schneider, Chairman of Manhattan Community Board 8, wrote years later, "[t]he original plans called for two structures to be built on the plaza - only one was eventually built."

33. On August 15, 1995, the Landmarks Commission approved a revised plan for the space. The Commission noted with approval that the changes, including the removal of the restaurant building from the Plaza, "recalled more accurately the historic open character and public accessibility of the plaza area."

34. After Bridgemarket Associates proposed additional design revisions, the Landmarks Commission continued to safeguard the public nature of the Plaza. For example, the Commission called for the height of the Plaza (which had been raised to accommodate retail space below) to be lowered so as to "enhance the visual and physical accessibility of the plaza by the public and therefore provide a further improved public-space from which to appreciate the special architectural and historic qualities of the monumental landmark bridge." A Landmarks Commission permit, issued on January 7, 1997, noted with approval the "improved public space."

35. On February 27, 1998, Mayor Rudy Giuliani announced the long-awaited Bridgemarket project was nearing completion. Under the deal, the City would lease the space under a master lease to Bridgemarket Associates, who would then sublease the space for use as a supermarket, a furniture store (which had replaced the greenhouse,) and a restaurant. Mayor Guiliani's press release boasted of the "new 20,000 square foot public plaza on the 59th Street

side of the bridge."

36. On December 8, 1999, the first of the three tenants to occupy the space – the Terence Conran Shop, a British furniture retailer, opened its doors to the public. The supermarket, Food Emporium, and the restaurant, Guastavino's, opened their doors in 2000.

37. On July 9, 2001, the Art Commission of the City of New York, which has jurisdiction over permanent works of architecture, landscape architecture, and art proposed on city-owned property, approved the installation of a mosaic-covered fountain which had originally been installed inside the public market. The fountain, entitled Abundance, by Edwin Blashfield, was to be installed on "59th Street, between 1st and York Avenues across from the Bridgemarket public space," the application stated.

38. On May 19, 2003, the Art Commission approved the installation of a plaque next to the Blashfield fountain. The approval stated that the plaque was to be installed at "Bridgemarket Public Plaza."

39. The Municipal Art Society, founded in 1893 to "beautify New York with public art," had funded the restoration of the historic Blashfield fountain. At the dedication ceremony on June 3, 2003, attended by Deputy Mayor Patricia Harris, the president of the Municipal Art Society remarked that "[o]riginally on the southeast side of the bridge, the fountain was relocated to the east end of the new public plaza during the renovation of Bridgemarket, by Hardy Holzman Pfeiffer Associates, completed in 1999."

40. The Plaza's status as a public space was recognized and celebrated by other non-profit organizations. For example, the New York City Landmarks Conservancy, a non-profit organization dedicated to preserving and protecting New York's unique architectural heritage, gave Bridgemarket its Lucy G. Moses Preservation Award in 2000. According to Roger Lang, its

then-Director of Community Programs, the Conservancy had "advocated tirelessly on Bridgemarket's behalf" since the inception of the project in 1977. The inscription on the award applauded the return of the city property to public use, with shops and a restaurant inside while "outside, a landscaped public plaza completes this remarkable retrieved ensemble."

41. In 2003, the Bruner Foundation awarded Bridgemarket its Rudy Bruner Award for Urban Excellence. In a 56-page report detailing the entire history of the redevelopment project, the Bruner Foundation described, along with the supermarket, retail store, and restaurant, the "public plaza and garden" which was "created as an amenity for the neighborhood."

42. On October 2, 2002, the New York City Planning Commission approved a resolution authorizing a new lease of the property, via the NYC EDC, to Bridgemarket Associates. This resolution, which was approved by the City Council on November 28, 2002 and approved by the Manhattan Borough Board on December 18, 2003, described a "public plaza along East 59th Street with landscaping and seating areas."

43. In 2005, Guastavino's closed its doors as a restaurant and reopened as a private event venue. In 2006, the following year, Plaintiff Rose Group Park Avenue took control of Guastavino's, which it began to market as "one of NYC's premier landmark gala and wedding destinations."

44. Beginning in or around 2006, upon information and belief, Guastavino's and the Rose Group Park Avenue began to advertise, market and sell exclusive access to, and use of, the Plaza (which they market as their "private garden") to their clients seeking to hold weddings, bar mitzvahs, galas, corporate conferences, and other events in their adjacent event hall. This use included the placement of corporate signage and installations on the Plaza, the placement of carpets on the Plaza, the projection of custom and corporate lighting onto the Plaza, the installation of games on the Plaza for exclusive use of events guests, the placement of tables,

chairs and sofas on the Plaza for exclusive use of event guests, and the serving of food and beverages, including alcoholic beverages, exclusively to event guests, on the Plaza. Upon information and belief, the marketing and sale of the exclusive use of the Plaza allowed Guastavino's and Rose Group Park Avenue to profit from the Plaza by attracting more potential clients to book events in their adjacent hall, convincing more clients to actually book events, and permitting them to charge those clients more than they otherwise would have been to charge.

44. Upon information and belief, none of the Corporate Defendants obtained special events permits issued from the City for the aforementioned use of the Plaza.

46. As of August 1, 2026, the Guastavino's web site advertises and offers "outdoor space" for events.

47. Beginning in or around 2006, upon information and belief, Guastavino's and Rose Group Park avenue began to close the Plaza to members of the public who were not affiliated with events taking place inside (via stanchions, security guards standing at the entrance to the Plaza instructing the public that the Plaza was closed, security guards approaching members of the public who had already entered the Plaza and instructing them to leave) even when the Plaza was not being actively used for events. Upon information and belief, this was done to create the appearance of an exclusive private garden for guests who were entering the event space or who left momentarily to smoke a cigarette, take a phone call, etc. in the Plaza. Upon information and belief, the marketing and sale of the existence of this exclusive "private garden" allowed Guastavino's and Rose Group Park Avenue to profit by attracting more potential clients to book events in their adjacent event hall, convincing more clients to actually book events, and permitting them to charge those clients more than they otherwise would have been to charge.

48. Beginning in 2000, upon information and belief, the Corporate Defendants made a series of changes to the Plaza which were not authorized by the Landmarks Commission, nor

other city agencies, and which did not conform to their original proposals for the space, but which did interfere with the ability of the public to use and enjoy the space, including:

a) placing "Guastavino's" signage on each side of the main plaza entrance on East 59th Street, creating the impression that the Plaza is part of the event venue, rather than a public space adjacent to it;

b) installing a trellis and planters at that same main plaza entrance, narrowing its width by two-thirds;

c) Installing additional trellises at each end of the Plaza and planting cultivating vines that climb those trellises, visually enclosing the space further;

d) removing the benches that were originally planned and shown in architectural drawings submitted and which existed when the Plaza opened;

e) installing approximately 20 metal planters containing trees and bushes, despite the specific demand from the Landmarks Commission that planters not be placed on the Plaza;

f) installing strings of overhead lights which form a canopy covering the entire Plaza and stretch from lightpoles near East 59th Street to the facade of the bridge itself;

g) installing signs stating "PRIVATE GARDEN – Available to the public at the discretion of Bridgemarket Associates," and

h) installing a sign near the eastern end of the Plaza (which employees of the Corporate Defendants use for parking their private vehicles) which reads "No Trespassing - Private Property - Violators Will Be Prosecuted."

49. Upon information and belief, the aforementioned physical changes to the Plaza were made in violation of the Corporate Defendants' leases with the City, which have required them to "protect the landmark nature of the Bridge and Plaza" and to receive prior written

approval from the City for any "work that would change, in any respect, the Bridge or the Arches and any plazas, open space or the exterior of any of the buildings on the premises."

50. Upon information and belief, in 2020, Defendant MADDD 550 Broad acquired the lease from Bridgemarket Associates for $42 million.

51. The lease between Defendant Maddd 550 Broad and the City, dated April 1, 2025, requires Maddd 550 Broad to maintain the plaza as "a sitting area accessible to the public." It also imposes on Maddd 550 Broad certain obligations (for example, to provide adequate security on the Plaza and to clean the Plaza each morning and evening,) that are consistent with its obligation to maintain the Plaza for public use.

52. Based on the fact that the ground lease with the City required Bridgemarket Associates and MADDD 550 Broad, respectively during their tenures, to control, manage and maintain the Plaza, Plaintiffs allege upon information and belief that the aforementioned physical changes to the Plaza were executed and maintained by Bridgemarket Associates and MADDD 550 Broad during their respective tenures as ground lease tenants. However, the respective roles of the Corporate Defendants (Bridgemarket Associates, MADDD 550 Broad, Guastavino's and Rose Group Park Avenue's) and/or their agents in installing, authorizing, maintaining, using, and failing to remove the aforementioned structures, alterations and conditions on the Plaza (which did interfered with the use and enjoyment of the Plaza by the public) are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

53. Some time in or around 2015, Plaintiff Khan was sitting in the Plaza. An employee of the Corporate Defendants asked him to leave. He left. Today, he frequently walks by the Plaza, sees it barricaded, and does not enter. He would like to visit and enjoy the Plaza and intends to do so if it is declared a public space.

54. During the summer of 2020, when gymnasiums in New York were closed due to COVID, Plaintiff Basinski went to the Plaza to exercise. An employee of the Corporate

Defendants told him he could not exercise there. Basinski left. Based on the employee's exercise of purported authority over the Plaza, the fact that Guastavino's appeared closed at the time, and the fact that the employee emerged from the small office between the supermarket and the event space, Plaintiffs allege upon information and belief that the employee was employed by either Bridgemarket Associates or MADDD 550 Broad (whichever company held the ground lease with the City at the time) or by a security contractor retained by Bridgemarket Associates or MADDD 550 Broad, and was acting within the scope of that employment or agency and subject to Bridgemarket Associates or MADDD 5550 Broad's (whichever company held the ground lease at that time) direction and control. The identity of that security guard, his employer, the contractual arrangements governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

55. On March 31, 2023, Basinski went to the Plaza to take photographs of several items of merchandise to sell on Ebay. Two employees of the Corporate Defendants told Basinski that he was trespassing on private property and requested that he leave. Basinski asked for a copy of the lease that the employees claimed gave them power to exclude others from the Plaza. One of the employees stated that, irrespective of what the lease said, the NYPD "understands, in the Community Affairs division, what the arrangement is." When Basinski asked that employee's name, he stated "don't worry about my name." When Basinski asked who he worked for, he replied "I work for the corporation that leases this on a long-term lease." When Basinski asked the name of that corporation, the employee replied "don't worry about that." Basinski asked to speak to the employee's supervisor but was refused. Basinski left. Based on the employee's exercise of purported authority over the Plaza, his responses to Basinski's questions, the fact that Guastavino's appeared to be hosting an event at the time, and the employee's attire, Plaintiffs allege upon information and belief that the employee was employed by either Guastavino's or

Rose Group Park Avenue, or by a security contractor retained by one of them, and was acting within the scope of that employment or agency and subject to Guastavino's or Rose Group Park Avenue's direction and control. The identity of that guard, his employer, the contractual arrangements governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

56. On June 7, 2023, Basinski again went to the Plaza to take photos. Two employees of the Corporate Defendants told Basinski that the Plaza was "part of the event space," that it was "private space" and that he was trespassing and had to leave. Basinski requested proof that the space was private, but received none. Basinski asked twice for one of the employee's names, but did not receive a response. He left. Based on the employees' exercise of purported authority over the Plaza, their attire, and the fact that Guastavino's appeared to be hosting an event at the time, Plaintiffs allege upon information and belief that the employees were employed by either Guastavino's or Rose Group Park Avenue, or by a security contractor retained by one of them, and were acting within the scope of that employment or agency and subject to Guastavino's or Rose Group Park Avenue's direction and control. The identity of those security guards, their employer, the contractual arrangements governing security at the Plaza at that time, and the entity or entities that directed and controlled their work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

57. On March 13, 2024, Basinski again went to use and enjoy the Plaza. An employee of the Corporate Defendants told Basinski that the Plaza was private property, that he had to leave, and that the police had been called and were on their way. Basinski requested documentation to support the Corporate Defendants' claim to the Plaza. The security guard claimed that the signs posted around the Plaza (declaring it a private garden) were sufficient legal basis. When Basinski asked the employee who his boss was, the employee responded "it doesn't

matter." After waiting about ten minutes, the police did not arrive, and Basinski left. Based on the employee's exercise of purported authority over the Plaza, his attire, and the fact that he appeared to be counting people entering Guastavino's for an event, Plaintiffs allege upon information and belief that the employee was employed by either Guastavino's or Rose Group Park Avenue, or by a contractor retained by one of them, and was acting within the scope of that employment or agency and subject to Guastavino's or Rose Group Park Avenue's direction and control. The identity of that guard, his employer, the contractual arrangement governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

58. In February, 2025, Plaintiff Ciavolino obtained employment nearby and began to, on occasion, use and enjoy the Plaza. On approximately five occasions over the following eighteen months, Ciavolino was denied access to the Plaza by the Corporate Defendants, who placed barricades at the entrance to the Plaza and told him it was closed. He would like to be able to use the Plaza freely and according to his own schedule and without regard to whether the Corporate Defendants have closed it on any given day.

59. On May 25, 2025, Basinski again went to take photos at the Plaza. An employee of the Corporate Defendants told Basinski that the Plaza was private property, that he had to leave, and asked why he could not respect the "private property" signs. Basinski left. Based on the employee's exercise of purported authority over the Plaza, his attire, and the fact that Guastavino's appeared to be hosting an event, Plaintiffs allege upon information and belief that the employee was employed by either Guastavino's or Rose Group Park Avenue, or by a security contractor retained by one of them, and was acting within the scope of that employment or agency and subject to Guastavino's or Rose Group Park Avenue's direction and control. The identity of that security guard, his employer, the contractual arrangement governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters

peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

60. During the summer of 2025, Plaintiff Rosenthal visited the Plaza while exploring Midtown East with his wife. After entering, he was asked to leave by an employee of the Corporate Defendants, who told him the Plaza was closed. He left. Assuming the Plaza was not a public space, he has not returned. Rosenthal would like to return to use and enjoy the Plaza and intends to do so if it is declared a public space.

61. On December 3, 2025, Basinski went to the Plaza to take photographs of merchandise for Ebay. Several security guards employed by the Corporate Defendants instructed Basinski to leave. Basinski refused and continued to photograph his Ebay merchandise. Defendant Rose told Basinski the plaza was "my property," then picked up various of Basinski possessions and threw them toward 59th Street. Defendant John Doe #1, an employee of the Corporate Defendants, told Basinski to stop recording him, then struck Basinski in the hand, knocking his phone to the ground. Basinski called 911 to report that six individuals (owners or employees of the Corporate Defendants) were surrounding him in public space, had taken his property, and were threatening him. Shortly thereafter, Lieutenant Tai and another officer from the NYPD's 19th Precinct arrived at the Plaza. Basinski explained to the officers that he had a longstanding dispute with the Corporate Defendants over whether the plaza was public space, stated that he believed it was, asked for any documentation to the contrary, and offered to show Lieutenant Tai evidence, on his phone, that the Plaza constituted public space. Insisting that the Plaza was private space, Lieutenant Tai then arrested Basinski, placed him in handcuffs, and had him transported to the 19th Precinct. Basinski was charged with Trespassing in violation of Section 140.05 of the New York State Penal Law.

62. Based on the fact that Defendant Louis Rose asserted control over the Plaza, that

he declared to the NYPD "I am the general manager of this establishment," that at least two security guards who joined him wore Guastavino's-emblazaoned uniforms, that at least one appeared to wear more formal attire, and that Guastavino's appeared to be hosting an event, Plaintiffs allege upon information and belief that some of the employees were employed by either Guastavino's or Rose Group Park Avenue, or by a security contractor retained by one of them, and were acting within the scope of that employment or agency and subject to Guastavino's or Rose Group Park Avenue's direction and control. The identity of the various employees, including John Doe #1, their employers, their job titles, the contractual arrangement governing work at the Plaza at that time, and the entity or entities that directed and controlled their work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery. Additionally, based on the fact that Louis Rose, introducing another employee to the NYPD, stated "this is the building manager from the entire ground floor lease," that the same employee wore less formal attire, and that he was subsequently seen exiting from the small office between the supermarket and event space, Plaintiffs allege upon information and belief that the employee was employed by either MADDD 550 Broad or by a security contractor retained by them, and was acting within the scope of that employment or agency and subject to MADDD 550 Broad's direction and control. The identity of that employee, his employer, the contractual arrangement governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

63. On December 22, 2025, the Trespassing charge against Basinski was dismissed at New York City Criminal Court.

64. On April 11, 2026, Basinski went to the Plaza. A security guard employed by the Corporate Defendants instructed Basinski that the Plaza was closed for a private party, that he

had to leave, and that he was trespassing. The guard told Basinski that he did not press charges because, as he stated, "I know the police." When Basinski asked the guard what his name was, he replied "it doesn't matter." Basinski left. Based on the employee's exercise of purported authority over the Plaza, his attire in a Guastavino's-emblazoned uniform, and the fact that Guastavino's appeared to be hosting an event, Plaintiffs allege upon information and belief that the employee was employed by either Guastavino's or Rose Group Park Avenue, or by a security contractor retained by one of them, and was acting within the scope of that employment or agency and subject to Guastavino's or Rose Group Park Avenue's direction and control. The identity of that security guard, his employer, the contractual arrangement governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

65. On April 16, 2026, Basinski went to the Plaza. Security guards employed by the Corporate Defendants instructed Basinski he had to leave. One of them instructed him that "this time, you're going to get locked up - you're going to go to the hospital, then you're going to go to jail" and that "this is the last time I'm warning you." Basinski left. Based on the employees' exercise of purported authority over the Plaza, the fact that one of the employees wore a Guastavino's-emblazoned uniform, and the fact that Guastavino's appeared to be hosting an event, Plaintiffs allege upon information and belief that the employees were employed by either Guastavino's or Rose Group Park Avenue, or by a security contractor retained by one of them, and were acting within the scope of that employment or agency and subject to Guastavino's or Rose Group Park Avenue's direction and control. The identity of those security guards, their employer, the contractual arrangement governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

66. On April 17, 2026, Basinski visited the Plaza to read a book. An employee of the

Corporate Defendants (the same man who had been identified on December 3, 2025 as “the building manager for the entire ground lease”) exited the small office next between the supermarket and event space, requested Basinski leave, and then called the NYPD. The employee spoke to Defendant Officers Canas and Guzman upon their arrival. Shortly thereafter, Defendant Officers Canas and Guzman told Basinski to leave the Plaza because it was private property, because “they had issues with you in the past” and because “they don’t want you here.” Officer Canas told Basinski that she knew it was private property because she was from the 19th Precinct and was familiar with the location because she went there “very often.” Basinski asked the officers for paperwork to support their claim that it was private property, to which Officer Canas replied, “I don’t need paperwork.” Basinski told the officers that it was public property and that he had done research establishing that fact, which he offered to share, which offer was not accepted. NYPD Officer Michael Hernandez told Plaintiff “you can’t be here any more.” Officer Canas told him that “I’m asking you to please not return.” Seven NYPD officers, including Lieutenant Stephen Schoefer, escorted Plaintiff from the Plaza. Officer Guzman told Plaintiff he would be arrested if he returned because it was private property and because the Corporate Defendants did not want him there. Based on the exercise of purported authority over the Plaza by the employee of the Corporate Defendants, his attire, and the fact that he exited from the office between the supermarket and the event space, and the fact that he had previously been identified by Defendant Louis Rose as “the building manager for the entire ground lease,” Plaintiffs allege upon information and belief that the employee was employed by MADDD 550 Broad, or by a security contractor retained by them, and was acting within the scope of that employment or agency and subject to MADDD 550 Broad’s direction and control. The identity of the employee, his employer, the contractual arrangement governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

67. On July 24 and July 25, 2026, a production company filmed a high-budget studio production (believed to be entitled "Escorted") for Amazon Prime Video inside Guastavino's, barricading and closing the entire Plaza and filling it with cameras, crew and equipment. Upon information and belief, the production company involved paid Guastavinos' and/or Rose Group Park Avenue for the use of the space, including the use of the Plaza. Upon information and belief, the City granted no permit and received no fee for the use of the Plaza.

68. On August 11, 2026, Basinski went to the Plaza to film a short Instagram video with his phone. A security guard employed by the Corporate Defendants instructed Basinski that he could not record a video at the Plaza because it was private property. Basinski left. Based on the exercise of purported authority over the Plaza by the employee, his attire, the fact that he exited from the office between the supermarket and the event space, and the fact that Guastavino's did not appear to be hosting any events at the time, Plaintiffs allege upon information and belief that the employee was employed by MADDD 550 Broad, or by a security contractor retained by them, and was acting within the scope of that employment or agency and subject to MADDD 550 Broad's direction and control. The identity of the employee, his employer, the contractual arrangement governing security at the Plaza at that time, and the entity or entities that directed and controlled his work are matters peculiarly within the knowledge of the Corporate Defendants and will be determined through discovery.

69. Basinski wishes to return to the Plaza to, *inter alia*, photograph items to sell on Ebay and make short Instagram videos about how he has been excluded from the Plaza, but is reluctant to do so due to Defendants' actions.

## FIRST CAUSE OF ACTION
## (DECLARATORY JUDGMENT - CPLR § 3001)

70. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

71. An actual, present and justiciable controversy exists between Plaintiffs and Defendants with respect to the legal status and public accessibility of the Plaza, including the authority of Defendants to exclude members of the public (who are not affiliated with events taking place inside) at their discretion, making a judicial declaration necessary to resolve the parties' rights and to prevent further deprivation of access by the public.

**SECOND CAUSE OF ACTION**
**(PUBLIC NUISANCE)**

72. Plaintiffs repeats and reallege the allegations contained in all preceding paragraphs as if set forth in full.

73. The Corporate Defendants have engaged, and continue to engage in conduct, as described, which substantially interferes with the rights of the public to occupy, use, and enjoy the Plaza, thereby constituting a public nuisance.

74. Plaintiff Basinski, who lives less than a block away from the Plaza, has had his property taken from him and thrown into the street, been threatened with assault, been assaulted, been arrested, been instructed not to return to the Plaza, and been threatened with arrest if he does so. Thus, while the general public has suffered and is suffering harm by its inability to use and enjoy the Plaza, Basinski has suffered, and continues to suffer, special injury which is different in kind from that suffered by the general public.

**THIRD CAUSE OF ACTION**
**(UNJUST ENRICHMENT)**

75. Plaintiffs repeats and reallege the allegations contained in all preceding paragraphs

as if set forth in full.

76. Defendants Guastavino's and the Rose Group Park Avenue have actively advertised, marketed and sold exclusive access to and use of the Plaza (their "private garden") as part of their private event offerings, while excluding the public from that same public space, thereby obtaining revenues, price premiums, rental enhancements, avoided costs, and other economic gains directly attributable to their unauthorized control and commercial exploitation of the plaza, and have therefore been unjustly enriched.

77. Upon information and belief, Defendants Bridgemarket Associates and MADDD 550 Broad did profit from the illegal use and commercial exploitation of the Plaza by their tenants, Guastavino's and/or Rose Group Park Avenue, via rent, fees, revenue-sharing agreements or other contractual consideration (the terms of which are solely in the possession and control of the Corporate Defendants,) the enhanced value and revenue-producing capacity of the leasehold, the increased financial strength and rent-paying capacity of the tenant, or some combination thereof, and have therefore been unjustly enriched.

**FOURTH CAUSE OF ACTION**
**(42 USC §1983 - STATE ACTORS)**

78. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

79. Lieutenant Tai unlawfully arrested Plaintiff Basinski, intended to confine him, and confined him without probable cause to believe that Basinski had committed any offense or violated any law, under color of state law and in violation of the First, Fourth and Fourteenth Amendments of the U.S. Constitution.

80. Officers Canas and Guzman, under threat of arrest and by a show of by physical

force and authority, ordered Plaintiff Basinski to leave the Plaza, a public space where had the right to be, an order to which Basinski complied. The officers acted under color of state law and in violation of the First, Fourth and Fourteenth Amendments of the U.S. Constitution.

**FIFTH CAUSE OF ACTION**
**(42 USC §1983 MUNICIPAL LIABILITY)**

81. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

82. Defendant the City, specifically the New York Police Department 19th Precinct, has an "arrangement" with the Corporate Defendants and has engaged in the practice, over multiple years and on many occasions, of violating the rights of members of the public to freely use and enjoy the Plaza, a public space. The City has engaged in a pattern and practice of, in response to requests from the Corporate Defendants, ordering members of the public to leave the Plaza on the false claim that it is private property, threatening them with arrest, and arresting them for trespassing, under color of state law, without lawful authority, without probable cause and in violation of their rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

**SIXTH CAUSE OF ACTION**
**(42 USC §1983 - PRIVATE ACTOR)**

83. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

84. The Corporate Defendants and Rose, despite being private actors, not state actors, acted under color of state law for purposes of 42 USC §1983 by acting jointly and in concert with the City – specifically the NYPD 19th Precinct, with whom the Corporate Defendants and Rose had "an arrangement" – by repeatedly summoning, requesting, directing, and encouraging NYPD

officers, lieutenants and sergeants from the 19th Precinct to remove members of the public (who were not affiliated with events taking place inside Guastavino's) from the public space, resulting in the exclusion, eviction, detention, arrest, threatened arrest and removal of members of the public, including Basinski, from public space, in violation of their constitutional rights under the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

85. The Corporate Defendants and Rose did, over the course of years, falsely and fraudulently inform the NYPD 19th Precinct that the Plaza was private space over which they exercised authority to remove members of the public, thereby using state authority to accomplish exclusions, evictions and arrests that they could not lawfully conduct on their own, depriving members of the public, including Basinski, of their rights secured by the First, Fourth and Fourteenth Amendments of the U.S. Constitution, including the right to be free from unreasonable seizure and arrest without probable cause.

**SEVENTH CAUSE OF ACTION**
**(TRESSPASS TO CHATTELS)**

86. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

87. Defendants Rose and John Doe #1 did, without his consent and with the intent to interfere with Plaintiff Basinski's personal property, did grab hold of that property, consisting of various shoes and accessories he was photographing, and throw them out of the Plaza and into the street on East 59th Street, thereby impairing Basinski's ability to use that property.

**EIGHTH CAUSE OF ACTION**
**(ASSAULT & BATTERY)**

88. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if set forth in full.

89. Defendant John Doe #1 did, with intent to do so, place Plaintiff Basinski in reasonable apprehension of imminent harmful or offensive unwanted bodily contact, and did, with intent to do so, cause offensive and unwanted bodily contact, by approaching Basinski, raising his hand, and striking Basinski in the hand.

90. Defendant John Doe #1 acted within the scope of his employment and in furtherance of the Corporate Defendants' business practices, making the Corporate Defendants liable under respondeat superior and/or because they directed, authorized, ratified, or maintained the practices that caused the contact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgement in this action:

1) certifying the proposed class pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2); 23(b)(3) and 23(c)(4), as warranted by the record developed in this action;

2) appointing the named Plaintiffs as representatives of the class and appointing Plaintiffs' counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

3) declaring the plaza on city-owned property in front of 409 East 59th Street in New York to be a public space;

4) enjoining the Corporate Defendants from selling, renting or using the Plaza in furtherance of events taking place in their adjacent indoor event space, known as Guastavino's, or excluding from the Plaza any member of the public, (via ropes, barricades, words or actions by their employees, etc.) due to the fact that they are not staff, clients or guests of events taking place at Guastavino's;

5) ordering the Corporate Defendants to restore and return the Plaza to such condition and

state so as to conform to plans submitted to and approved by the City;

6) holding that the Corporate Defendants' practice of excluding members of the general public (who are not staff, clients, or guests of events taking place at Guastavino's) from the Plaza, depriving them of the use and enjoyment of the space, constitutes a public nuisance;

7) ordering an accounting of the revenue derived by the Corporate Defendants as a result of their illegal and unauthorized use of the Plaza, for which they were unjustly enriched, to be paid into a into a court-approved restoration fund dedicated to the preservation of public space in Midtown East;

8) awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

9) granting Plaintiffs disbursements, costs and attorney fees incurred in this action, and

10) granting such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York, New York
October 19, 2026

**/s/ Sean Basinski**

SEAN BASINSKI
1073 First Avenue, #44
New York, NY 10022
seaninnigeria@gmail.com